IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

PHILIP DOMINIC SALVIA,

|  |  |  |
|---|---|---|
| | Plaintiff, | OPINION & ORDER |
| v. | | |
| | | 14-cv-237-wmc |
| ADAM FELL and CHRIS WEISS, | | |
| | Defendants.[1] | |

---

The Wisconsin State Capitol has regularly been the site of controversy, particularly so over the past few years. Although there have long been rules in place regarding use of the Capitol space, following weeks of very large protests in 2011, those rules were revised, and revised again, including an "emergency" modification in April of 2013, which is the subject of the present lawsuit. On July 24, 2013, plaintiff Philip Dominic Salvia was present at the Capitol during a gathering of the "Solidarity Singers," a loose collection of people who have regularly gathered to sing protest songs at noon on weekdays since the 2011 protests. When the gathering that day grew to exceed twenty people, Salvia was singled out for arrest and cited for violating the Wisconsin administrative code.

Though that citation was eventually dropped, plaintiff nevertheless brought this federal lawsuit, alleging that defendants Adam Fell and Chris Weiss, both Capitol Police officers, violated his First and Fourth Amendment rights by arresting him under the code. Both sides have moved for summary judgment: plaintiff seeks a judgment of liability in his favor (dkt. #8); defendants seek dismissal of his claims on grounds of qualified immunity

---

[1] The parties stipulated to the dismissal of all claims against another defendant, David Davis, on December 1, 2014. (Dkt. #29.) Davis was terminated as a defendant without further order of the court on December 4th pursuant to Fed. R. Civ. P. 41(a)(1).

(dkt. #13).  For the reasons explained below, the court will grant defendants summary judgment on qualified immunity grounds with respect to plaintiff's viable First Amendment challenge, but it concludes that fact issues preclude entering judgment for either party on the Fourth Amendment claim.  Accordingly, the court will deny both motions with respect to that claim.

## UNDISPUTED FACTS[2]

### A. Parties

Plaintiff Salvia is an adult resident of Madison, Wisconsin.  He is employed as a radio personality on "The Devil's Advocates" talk show, which broadcasts every weekday on "The Mic" 92.1 FM radio station in Madison.  (Defs.' Resp. PPFOF (dkt. #23) ¶ 53.) Salvia covers protests, demonstrations and other events at the Capitol.

The Wisconsin State Capitol Police Department is a division of the Wisconsin Department of Administration ("DOA"), which is responsible for the management of government buildings under Wis. Stat. § 16.84(1), including the adoption of rules.  At all times relevant to the complaint, Michael Huebsch was the DOA Secretary.  The two defendants remaining in this case, Adam Fell and Chris Weiss, are and were at all relevant times, members of the Capitol Police Department; Fell as an Officer and Weiss as a Sergeant.  (Pl.'s Resp. DPFOF (dkt. #32) ¶¶ 2-3.)

---

[2] Unless otherwise noted, the court finds the following facts, which are drawn from the parties' summary judgment submissions, to be material and undisputed.

## B. Background

### i.    Capitol rotunda[3]

Wisconsin's State Capitol rotunda has been at the center of public discourse since its completion in 1917.  The rotunda was designed to be the center of public interaction among the three branches of state government, the county and city, the University of Wisconsin and the public.  Surrounding the rotunda are four massive wings: the west wing houses the State Assembly; the east wing, the Governor's Office and the Wisconsin Supreme Court; the south wing, the State Senate; and the north wing, the North and Grand Army of the Republic Memorial Hearing Rooms.

According to the "Nomination of the Capitol as a National Historical Landmark" of June 10, 2000, there is a clear demarcation between the public and private spaces of the Capitol.  The public spaces are monumental in scale and ornate in décor; the private offices are intended to be adaptable to changing needs and are constructed on a smaller scale. There are two general gathering places under the Capitol dome:  the ground floor of the rotunda, and the first floor circular rotunda, which includes a circular overlook of the ground floor rotunda at its center.

According to the DOA, the first floor rotunda can seat a maximum of 200.[4]  The DOA has determined that the ground floor rotunda corridors and first floor corridors do not work well for large groups or events, but may be appropriate for small groups or short events.  According to the DOA's website, numerous events occur regularly on the first floor

---

[3] Many of plaintiff's undisputed facts are drawn from this court's opinion in *Kissick v. Huebsch*, 956 F. Supp. 2d 981(W.D. Wis. 2013), including a fuller description of the Wisconsin State Capitol rotunda.  *See id.* at 985-87.

[4] The parties dispute whether this conclusion appears in a DOA "publication" or "regulation," but the difference appears immaterial.

rotunda, including American Red Cross blood drives, the State Superintendent's State of Education Address, annual Kiwanis Clubs Christmas pageants and choral concerts.

### ii.   Capitol permitting and access policies

Administrative rules requiring a permit for public events in the State Capitol have been in existence since at least 1979, and they were codified at Wis. Admin. Code § Adm 2 ("Adm 2") on February 6, 1998.  The 1998 version of Adm 2 allows the DOA to permit building and facilities to be used for "the purpose of governmental business, public meetings for the free discussion of public questions, or for activities of a broad public purpose" subject to reasonableness considerations.  Members of the public seeking to use the Capitol for those purposes were instructed to apply in writing to the DOA at least 72 hours in advance.  Beyond that requirement, the 1998 version of Adm 2 provided no guidance as to what activities triggered the permitting requirement.

The Adm 2 requirement garnered little controversy over most of its lifetime. Between 2006 and 2013, the number of applications consistently ranged between 430 and 517 each year.  The then Chief of the Capitol Police also granted a majority of those applications, and no citations were issued for holding an event without a permit until after 2010.

In February of 2011, individuals and groups gathered at the State Capitol to protest politically charged issues, including legislation changing the collective bargaining rights of most Wisconsin public employees.  Singing emerged as a popular form of protest during this time; some of this singing became known as the "Solidarity Sing Along," with participants usually gathering in the Capitol rotunda on an informal basis at noon on most weekdays.

4

The Solidarity Sing Along did not have a permit to gather in the rotunda.

In November or December of 2011, the DOA issued a State Facilities Access Policy ("Access Policy") as supplemental guidance for the public.[5]  The Access Policy outlines specific conditions governing the public areas of the Capitol, information for scheduling events, requirements for obtaining a permit, enforceability of the permits and other key provisions relating to the public's access to the Capitol.

By July of 2012, when David Erwin was first appointed Chief of the Wisconsin Capitol Police, the scale of the protests had significantly diminished, with the average number of people in the rotunda dropping from the thousands daily to fewer than one hundred.  Chief Erwin nevertheless announced plans to begin strictly enforcing the Capitol's rules in an effort to "restore normalcy and safety" to the building.  A few months later, in September of 2012, Capitol Police began to arrest protestors in the Capitol and issue citations for failure to comply with the regulations and Access Policy.

In April of 2013, in order to gain greater compliance from user groups regarding the Capitol's permit requirement, the state approved "emergency" modifications to Adm 2. (Lazar Decl. (dkt #19) Ex. K.)  In line with the "emergency" modifications, the DOA made corresponding revisions to the Access Policy.  For purposes of this opinion, which involves events that occurred on July 24, 2013, the April 2013 "emergency" modifications to Adm 2 and the April 2013 Access Policy are the relevant law.[6]  (Defs.' Resp. PPFOF (dkt. #23)

---

[5] Plaintiff's proposed findings of fact indicate the Access Policy was issued in November, while defendants' proposed findings of fact indicate it was issued on December 16, 2011.  Neither side disputes the other's proposed fact.  (Defs.' Resp. PPFOF (dkt. #23) ¶ 29; Pl.'s Resp. DPFOF (dkt. #32) ¶ 10.)  The court need not resolve this discrepancy, however, as the exact date of the original Access Policy's promulgation is not material.

[6] Unless otherwise noted, all references to the Access Policy in the remainder of this opinion refer to the April 2013 modified version.

¶ 33.)

At that time, Wis. Admin. Code § Adm 2.14(2)(v) read in relevant part that:

> (2) In order to preserve the order which is necessary for the enjoyment of freedom by occupants of the buildings and facilities, and in order to prevent activities which physically obstruct access to department lands and buildings or prevent the state from carrying on its instructional, research, public service, or administrative functions, and pursuant to s. 16.846, Stats., whoever does any of the following shall be subject to a forfeiture of not more than $500:
>
> . . .
>
> (v) Without approval of the department, conducts an event in those buildings and facilities managed or leased by the department or on properties surrounding those buildings.

Defendants have also stated that they would likely have amended plaintiff's citation to refer to § Adm 2.14(2)(vm), had they not ultimately dropped it. (Decl. of Jeff Scott Olson Ex. B (dkt. #12-1) ¶ 12.) That section read in part:

> Any participant or spectator within a group constituting an unlawful assembly, who intentionally fails or refuses to withdraw from the assembly after it has been declared unlawful, shall be subject to the penalties identified in sub. (2) (intro.).

The April 2013 Access Policy required the public to apply for a permit in advance of any performance, ceremony, presentation, meeting, rally, organized tours not led by department or legislative staff or officials, festival, reception or the like held in public areas of state facilities or buildings. (Defs.' Resp. PPFOF (dkt. #23) ¶ 35.) Expressly exempted from the permitting requirement were: (1) informal tourist activities; (2) constituents or members of the public visiting elected officials otherwise conducting routine business with any state agency or state entity; (3) "spontaneous" events, defined as any gathering of people for the purpose of actively promoting any cause, whether by conducting a picket,

parade, demonstration or the like in response to an unforeseen triggering event that has occurred within the preceding three calendar days; (4) any event on the Capitol lawn expecting fewer than 100 people; and (5) any rally (defined as a gathering of people for the purpose of actively promoting any cause) inside the Capitol consisting of fewer than four people.  (*Id.* at ¶ 36.)

The Access Policy granted the power to enforce the permit requirements to the Capitol Police.  (*Id.* at ¶ 37.)  Events with or without permits could be terminated if the Capitol Police Shift Commander on duty determined that the event was believed to have exceeded the attendance estimate or the capacity of the building, or if the continuation of the event would constitute a danger to the health, safety or welfare of the public.

Wisconsin's Adm 2 is posted on the DOA's website for the public's access.  Press releases regarding the permitting rules are also posted on that website and were available in July of 2013.

### iii.   *Kissick v. Huebsch* **and its aftermath**

On September 13, 2012, Michael Kissick went to the Capitol intending to join the Solidarity Sing Along and found Capitol Police issuing tickets to participants.  He filed suit in this court on February 11, 2013, to seek relief from the permitting requirements contained in the regulations and Access Policy.  *See Kissick v. Huebsch*, 956 F. Supp. 2d 981 (W.D. Wis. 2013).   After conducting evidentiary proceedings, the court issued a preliminary injunction on July 8, 2013, which precluded Secretary Huebsch and Chief Erwin from enforcing parts of the Access Policy.  Specifically, the court enjoined (1) the content-based distinction found in § 3.J of the Access Policy, and (2) the requirement for

permitting of Capitol events anticipated to attract twenty or fewer persons.  *Kissick*, 956 F. Supp. 2d at 1007.

In entering the preliminary injunction, the court recognized that the permitting process served significant governmental interests in the abstract -- for example, by ensuring the presence of adequate police resources at the Capitol and managing competing demands for public space, *id.* at 1000-01 -- but concluded that the permitting requirement for groups of four or more "[drew] in too much expressive conduct in exchange for too little administrative benefit."  *Id.* at 1005.  The court explained, however, that its selection of the number twenty as a "numerical floor" was merely "preliminary," chosen in an attempt to "protect the fundamental rights of plaintiff and others like him to freely assemble and engage in speech while permitting defendants the ability to manage the competing demands on the rotunda and quickly call on additional police officers if necessary."  *Id.* at 1007.  Two days later, DOA Secretary Huebsch issued a statement, posted on the DOA's website, indicating that the DOA would not appeal the decision and that the permit process remained in full effect as modified by the court's order.  There is no dispute that defendants were aware of *Kissick* on July 24, 2013, the date relevant to this lawsuit.

After the opinion in *Kissick* issued, Capitol Police began to count the number of people involved in non-permitted events inside the Capitol.  Once the number of people involved exceeded twenty and it had been confirmed no permit was issued, the event was declared "unlawful" under the Wisconsin administrative code.  At that point, the Capitol Police would post a two-sided sign in the center of the rotunda declaring the event unlawful and asking that participants disperse, in substantially the following form:

> If we determine that your event is larger than 20 people and you do not have the required permit we will declare the event unlawful. If participants do not move outside or disperse they will be subject to arrest.

An announcement would also be broadcast twice over the speaker system, stating:

> Attention in the Capitol. This is the State Capitol Police Chief David Erwin. I have determined that your group or event does not have the required permit. I am declaring this an unlawful event. Please move your group outside or disperse immediately. If you do not, each participant is subject to arrest.

Until the announcement was broadcast twice, Capitol Police officers would not approach individuals. Following the second broadcast, officers would then approach individuals, inform them the event was unlawful and again ask them to leave the Capitol.

According to defendants, if an individual left or dispersed after *any* of these warnings, he or she would not be arrested. Salvia disputes that fact on the basis of his own experience, which the court will address further below. (*See* Pl.'s Resp. DPFOF (dkt. #32) ¶ 28.) If an individual refused to heed the warnings, however, he or she would be deemed a "participant," arrested and issued a citation. Whether or not consistently followed in practice, these rules and the warning protocol were in place on July 24, 2013.

### C. Events of July 24, 2013

On July 24, 2013, Solidarity Sing Along participants arrived at the State Capitol and began singing. The participants did not obtain a permit. (In fact, no permits were issued for any gatherings or events that day.) Defendants Fell and Weiss were on duty at the Capitol during that day's sing-along. While Salvia was also present, he explains that it was only to meet with his radio co-host, Michael Crute, during which he noticed the Solidarity Sing along had begun and began to observe the event in his capacity as a journalist.

Defendants offer no evidence to place his version of events into dispute.  (Defs.' Resp. PPFOF (dkt. #23) ¶ 54.)

At some point after noon, the Capitol Police Department determined that the group had grown to include more than twenty participants.  Therefore, they declared the sing-along an "unlawful event," placed the sign and broadcast the two warning announcements.  Some individuals left the Capitol in response to these initial warnings.  (Pl.'s Resp. DPFOF (dkt. #32) ¶¶ 33-35.)

At that point, Officer Fell was instructed to begin approaching individuals to advise them that their event was unlawful and that they needed to leave.  If they refused, Fell was then to arrest them and give them a citation.   Pursuant to these instructions, Fell approached Salvia, who was standing nearby and taking photographs (defendants characterize this behavior as "participating").  Fell did not yet have Salvia's name.  As instructed, however, he did advise Salvia that he was participating in an unlawful event and had to leave the Capitol or he would be arrested.

According to defendants, Salvia made no move to leave at that time; rather, he stated he was part of the media and was just taking pictures.  Salvia agrees he did not leave, but actually responded, "I just read the sign, yeah."  Officer Fell then warned Salvia a second time that the event was unlawful and he needed to leave.  In response, Salvia asked if he "had to leave right now," and Fell advised him that he did.  (Pl.'s Resp. DPFOF (dkt. #32) ¶ 39.)

According to defendants, in spite of these repeated warnings, Salvia never turned to leave the event, making his continued presence disruptive.  Salvia, however, contends that

he began to walk away after the second warning by Officer Fell, intending to obey the command to leave the area.

After these verbal warnings, however, there appears no dispute that Sergeant Weiss approached Officer Fell and instructed him to arrest Salvia (Salvia contends that Weiss ordered Fell to "95 him!", with 10-95 being the standard police code for "subject in custody"). Accordingly, Fell told Salvia that he was under arrest. Salvia then asked, "For what, exactly?" To which Fell responded, "For participating in an unlawful event."

Officer Fell then asked Salvia to turn around so that Fell could place flex handcuffs on his wrists. During the course of the arrest, Salvia asked a series of follow-up questions:

> "I thought I was just covering the event? I was just taking pictures of the crowd and reading the sign.
>
> Am I not allowed to do that as a member of the media, sir? Sir?
>
> What? You're arresting…
>
> Just for the record, I took a picture. I took a picture of the crowd as a member of the media.
>
> Does that matter to you?
>
> Does it matter to you? Does it matter to you, sir? Working media is irrelevant?
>
> All these other people are here with cameras and they are not getting arrested."

(Decl. of Philip Dominic Salvia (dkt. #11) ¶ 14.) Both Fell and Weiss verified that the handcuffs fit Salvia properly and were not too tight. Fell then escorted Salvia to the Capitol basement for processing, where he first learned Salvia's name.

It is undisputed that neither of the defendants was aware that Salvia was a member of the media when they arrested him. Although he told them he was, defendants searched

Salvia for credentials prior to arrest and found nothing, and a photograph of the arrest in the record shows that Salvia had no visible press credentials or badges on his person.  At the same time, the officers never asked him for press credentials, nor did Salvia show Fell a press pass or media credentials at that time or at any other time on July 24, 2013.  Other media members were present on July 24 and wore identifiable press credentials; any members of the press with visible credentials were not asked to leave.

Fell issued plaintiff a citation at about 12:20pm, and then plaintiff was released.  Specifically, Salvia was cited under Wis. Admin. Code § Adm 2.14(2)(v), which subjected him to a forfeiture for "conduct[ing] an event" without approval.  "Event" was defined at § Adm 2.03(3m) as:  "any performance, ceremony, presentation, meeting, rally, organized tours not led by department or legislative staff or officials, festival, reception or the like held in public areas of state facilities or buildings.  The term 'event' does not include activities such as: informal tourist activities; constituents or members of the public visiting elected officials otherwise conducting routine business with any state agency or state entity."

Salvia retained legal counsel to represent him in connection with the defense of the citation he had received.  However, that citation was eventually dismissed by the Department of Justice on October 31, 2013, a few weeks after the *Kissick* case settled.[7]

---

[7] On October 8, 2013, the parties in *Kissick* entered into a settlement agreement amending, among other changes, the permit requirements for groups consisting of twelve or more participants. The agreement acknowledged the DOA's authority to manage and operate the Capitol and establish a permit system, but further stipulated that events involving twelve or more participants could lawfully take place if groups either: 1) obtained a permit as set forth under the Access Policy and Rules, or 2) gave notice (in person, by telephone if practical, by email, or on a form supplied by DOA or on a computer system, if available) no less than two business days and no more than ten business days before the planned event.  (Lazar Decl. (dkt # 19) Ex. M.)  The DOA issued a press release the same day that attached a copy of the settlement agreement.  Following the settlement agreement, the DOA promulgated new emergency rules, effective on November 27, 2013, codifying these changes to Adm 2.

Salvia then brought the present lawsuit alleging that Wis. Admin. Code § Adm 2.14(2)(v) was unconstitutional, both facially and as applied to him, and that he was arrested without probable cause in violation of the First and Fourth Amendments, respectively.

## OPINION

### I.  Standard of Review

Before the court are cross-motions for summary judgment.  As with any summary judgment motion, the court construes all facts and draws all reasonable inferences from those facts in favor of the non-moving party.  *Laskin v. Siegel*, 728 F.3d 731, 734 (7th Cir. 2013); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Thus, in resolving plaintiff Salvia's motion, the court credits defendants' version of the facts and draws all reasonable inferences in their favor; and in resolving defendants' motion, the court credits plaintiff's version of the facts and draws all reasonable inferences in his favor.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude summary judgment."  *Anderson,* 477 U.S. at 248.

The party moving for summary judgment bears the initial burden of informing the district court of the basis for its motion.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  For an issue on which the nonmoving party will bear the burden of proof at trial, the nonmoving party must then "go beyond the pleadings" and "designate specific facts showing that there is a genuine issue for trial."  *Id.* at 324 (internal quotation marks omitted).  It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Nor may the nonmoving party "merely rely on conclusory pleadings" to withstand the motion.  *Colan*

*v. Cutler-Hammer, Inc.*, 812 F.2d 357, 361 (7th Cir. 1987).  Rather, the nonmoving party must produce "evidence . . . such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  If he fails to do so, "[t]he moving party is 'entitled to a judgment as a matter of law.'"  *Celotex*, 477 U.S. at 323.

Here, defendants move for summary judgment on the basis of qualified immunity.  Pursuant to that doctrine, "[p]ublic officials 'performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir. 1998).  "[S]tated rather concisely, the defense of qualified immunity 'gives public officials the benefit of legal doubts.'"  *Donovan v. City of Milwaukee*, 17 F.3d 944, 951 (7th Cir. 1994) (quoting *Elliott v. Thomas*, 937 F.2d 338, 341 (7th Cir. 1991)).  Even though qualified immunity is a defense, plaintiff bears the burden of defeating it.  *See Molina ex rel. Molina v. Cooper*, 325 F.3d 963, 968 (7th Cir. 2003).

The qualified immunity inquiry consists of a two-step sequence.  "First, a court must decide whether the facts that a plaintiff has alleged . . . or shown . . . make out a violation of a constitutional right."  *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (internal citations omitted).  "Second, if the plaintiff has satisfied this first step, the court must decide whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct."  *Id.*  Courts may exercise "sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Id.* at 236.  In this case, which asks the court to rule on the constitutionality of now-defunct provisions of the Wisconsin Administrative Code and the

14

fact-intensive question of whether defendants had probable cause to arrest Salvia, the court elects to analyze first the question of whether defendants violated Salvia's clearly established rights.

"A constitutional right is clearly established when 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" *Estate of Escobedo v. Martin*, 702 F.3d 388, 404 (7th Cir. 2012) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)); *see also Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)) ("For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"). In contrast, "[i]f officers of reasonable competence could disagree on the issue [of whether or not an action was constitutional], immunity should be recognized." *Id.* (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Thus, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley*, 475 U.S. at 341. A plaintiff may show that a right was clearly established either by "show[ing], on some level, that a violation of this right has been found in factually similar cases, or that the violation was so clear that a government official would have known that his actions violated the plaintiff's rights even in the absence of a factually similar case." *Lee v. Young*, 533 F.3d 505, 512 (7th Cir. 2008).

## II.    First Amendment Challenges

The core of plaintiff's case is that the permitting rules violated the First Amendment by purporting to make unpermitted, small-group events unlawful and, by extension, purporting to make unlawful Salvia's observation of those events. As to both alleged

violations, plaintiff also pleads:   an as-applied challenge -- one that "charges an act is unconstitutional as applied to a plaintiff's specific activities even though it may be capable of valid application to others," *Surita v. Hyde*, 665 F.3d 860, 875 (7th Cir. 2011); and a facial challenge of overbreadth -- one that alleges that the regulation's "unconstitutional applications against otherwise protected expression outnumber [its] legitimate ones," *Bell v. Keating*, 697 F.3d 445, 453 (7th Cir. 2012).

## A.  Facial Challenge

Oddly, defendants never question plaintiff's standing to bring a facial challenge to the April 2013 version of the regulations and Access Policy, even though it expired over two years ago.[8]   Generally, facial challenges to statutes or rules are coupled with requests for injunctive and declaratory relief seeking to invalidate allegedly unconstitutional provisions. *See Bell*, 697 F.3d at 453 (noting that an overbreadth challenge "demands injunctive and declaratory relief if successful"); *Ezell v. City of Chi.*, 651 F.3d 684, 698 (7th Cir. 2011) (noting that in a facial challenge, "[t]he remedy is necessarily directed at the statute itself and *must* be injunctive and declaratory") (emphasis in original).

In contrast, Salvia seeks only compensatory and punitive damages.  (Compl. (dkt. #1) ¶¶ 601-02.)  Of course, his decision not to seek an injunction is sensible: the April 2013 version of Adm 2 and the Access Policy have long been defunct, and there is little or no conceivable risk of their reinstatement.  Thus, any request for injunctive relief Salvia might

---

[8] Defendants *do* ask the court to reject plaintiff's facial challenge, but only on the grounds that Salvia failed to discuss the sections of the administrative code meaningfully and thereby waived any challenge he might otherwise have asserted.  (Defs.' Combined Br. Support & Opp'n (dkt. #14) 58-60.)  Given the substantial space that plaintiff devotes in his opening brief to arguing that:  (1) the regulations were not a valid time, place and manner restriction; and (2) *Kissick* did not supply a narrowing construction for the regulations, the court disagrees with defendants' contention that Salvia waived his ability to pursue a facial challenge.

have brought would be moot.  *E.g.*, *Thayer v. Chiczewski*, 705 F.3d 237, 256 (7th Cir. 2012) (request for injunction on facial challenge moot where challenged provision invalidated by court); *Miller v. Benson*, 68 F.3d 163, 164-65 (7th Cir. 1995) (per curiam) (amendment to statute rendered judicial proceedings moot); *Freedom From Religion Found., Inc. v. City of Green Bay*, 581 F. Supp. 2d 1019, 1028-29 (E.D. Wis. 2008) (effectively permanent change to city policy mooted claim for injunctive relief); *see also Utah Animal Rights Coalition v. Salt Lake City Corp.*, 371 F.3d 1248, 1256-57 (10th Cir. 2004) (repeal of challenged statute rendered request for injunctive relief moot).

Even after the repeal or amendment of a challenged law or regulation, however, a litigant may still continue with a facial challenge if he retains a live claim for damages.  For instance, in *Kraimer v. City of Schofield*, 342 F. Supp. 2d 807 (W.D. Wis. 2004), this court considered whether the Schofield City Council's decision to repeal one of the challenged ordinances, which required the plaintiffs to obtain a Public Entertainment/Exhibition License before operating an indoor theater, mooted the plaintiffs' facial challenge.  The plaintiffs in that case conceded that their request for injunctive relief was moot but maintained they were "entitled to seek actual damages for any injuries suffered as a result of the application of the ordinance before it was repealed[.]"  *Id.* at 819.  This court concluded that the plaintiffs had alleged harm by virtue of the operation of the ordinance itself and permitted the claim to proceed.

> In this case, plaintiffs have alleged that they were unable to present nude dancing in April 2003, when they wanted to, because § 11.20 was in effect.  They say that they censored themselves by refraining from presenting the dance entertainment they would have presented had it not been for the existence of § 11.20.  Repeal of the ordinance in December 2003 did nothing to eradicate the effects that plaintiffs felt eight

17

> months earlier.  Therefore, I am persuaded that the issue is not
> moot.

*Id.* at 820.

The District Court for the Eastern District of Wisconsin analyzed a similar situation in *Clarkson v. Town of Florence*, 198 F. Supp. 2d 997 (E.D. Wis. 2002).  In *Clarkson*, the plaintiff brought a facial challenge to an ordinance prohibiting nude dancing in taverns, which the Town repealed during the course of the litigation.  The court concluded that the request for injunctive relief was moot, *id.* at 1004, but that the claim for monetary damages survived the ordinance's repeal.  In so holding, the court noted that the plaintiff "presented evidence that *enactment of the ordinance harmed her* in various ways," including evidence that it stymied her attempt to sell her tavern, resulted in a loss of business and caused tangible, non-economic harm to her health and behavior.  *See id.* at 1003-04 (emphasis added).  Thus, the court permitted the damages claim to proceed.

This case differs from *Kraimer* and *Clarkson* in one critical way.  In those cases, the plaintiffs alleged that they suffered harm caused simply by the challenged ordinance's existence (that is, they were forced to censor themselves).  In contrast, here, Salvia does *not* allege that he suffered any harm due to the mere *existence* of the April 2013 regulations and Access Policy.  For instance, he does not allege being forced to censor his First Amendment activity, as in *Kraimer*, nor that the enactments harmed his economic interests, as in *Clarkson*.  Rather, Salvia contends that he suffered damages "[b]y virtue of the *unlawful actions of the Defendants*" (Compl. (dkt. #1) ¶ 601 (emphasis added).)  In fact, a review of the complaint reveals that *all* of the facts Salvia alleges are related to defendants' enforcement

of Adm 2 and the Access Policy against him -- that is, their actions in arresting him -- not to the enactment of the regulations themselves.  (*See id.* at ¶¶ 401-417.)

This is the hallmark of an as-applied challenge, not a facial challenge: "[i]n a facial constitutional challenge, individual application facts do not matter.  Once standing is established, the plaintiff's personal situation becomes irrelevant."  *Ezell*, 651 F.3d at 698.  Likewise, the specific categories of damages Salvia seeks -- for attorney fees expended in fighting the citation, inconvenience, loss of liberty, emotional distress and so forth -- appear to be connected to defendants' *application* of the regulations as well.

In this way, the present case bears significant similarities to *Daskalea v. Washington Humane Society*, 710 F. Supp. 2d 32 (D.D.C. 2010).  In that case, the plaintiffs brought a facial challenge to the District of Columbia's Freedom from Cruelty to Animal Protection Act, which was later amended with the effect of mooting the plaintiffs' claim for injunctive relief.  The plaintiffs maintained, however, that they could still obtain monetary damages in connection with their facial challenge, an argument the D.C. district court flatly rejected.

> Plaintiffs' arguments on this point are based on a fundamental misunderstanding of the differences between their facial constitutionality challenge, which is the sole claim now at issue, and their as-applied challenge to the Act.  As Plaintiffs themselves acknowledge in their Supplemental Memorandum, the individual Plaintiffs claim that they were injured by the allegedly "unlawful acts" taken by the Individual Defendants pursuant to the terms of the Act as previously written[.] . . . In other words, Plaintiffs allege that they were damaged by the manner in which the prior version of the animal cruelty statute was ***applied*** to them.  Plaintiffs have not, however, alleged - nor do they now argue - that they were damaged in any way by the ***enactment*** of the allegedly unconstitutional statute in this case.

*Id.* at 43 (emphasis in original).  Accordingly, the court concluded that the amendments to the Act mooted the plaintiffs' facial challenge -- although it was careful to hold that its

conclusion "[did] *not* eliminate Plaintiffs' ability to pursue their damages claim in connection with their as-applied challenge to the Act." *Id.* at 45 (emphasis in original).

In this case, as in *Daskalea*, Salvia has alleged he suffered damages "by the manner in which the prior version of [Adm 2 and the Access Policy] was ***applied***" to him. *Id.* at 43 (emphasis in original). While granting plaintiff a further opportunity to amend this defect *might* be appropriate in another case, the court is disinclined to grant it here for three reasons. First, as already discussed, the challenged regulations and Access Policy are no longer being enforced. Second, it is far from clear that Fell and Weiss -- individual members of the Capitol Police, who appear to have played no role in *enacting* the allegedly unconstitutional regulations -- would be appropriate defendants for purposes of a facial challenge. *See* Nicholas Quinn Rosenkranz, *The Subjects of the Constitution*, 62 Stan. L. Rev. 1209, 1238 (2010) ("The notion of a challenge to a statute is a deceptive euphemism; the challenge is to the action of a governmental actor. And a 'facial challenge,' in particular, is a challenge to the action *of a legislature*.") (emphasis added). Certainly, a more appropriate defendant would have been the DOA's Secretary, who adopted the regulations and Access Policy, or at least the Capital Police Chief, who appears to have been its major proponent. Third, plaintiff has had plenty of time to seek such an amendment and it would be unfair to the named defendants to allow a moving target as to the nature of plaintiff's claimed damages after otherwise prevailing on summary judgment, at least as to plaintiff's First Amendment claim.

Accordingly, the court concludes that Salvia's purported "facial challenge" is not viable, at least not given the disconnected nature of the damages he seeks from the enactment of the ordinance and the named defendants' total lack of involvement in the

enactment of the challenged regulations and Access Policy. Rather, the court will focus on the as-applied challenge he actually pled: whether Fell and Weiss violated Salvia's clearly established First Amendment rights when they *applied* the allegedly unconstitutional regulations in arresting him and issuing him a citation.

### B. Good Faith Immunity

Much of Salvia's as-applied argument is devoted to analyzing why neither *Kissick* nor the DOA's response to *Kissick* constitutes a "limiting construction" of the regulations, but the concept of a "limiting construction" comes into play only with respect to facial challenges. *See, e.g., Ward v. Rock Against Racism*, 491 U.S. 781, 795-96 (1989) ("Administrative interpretation and implementation of a regulation are, of course, highly relevant to our analysis, for '[i]n evaluating a facial challenge to a state law, a federal court must . . . consider any limiting construction that a state court or enforcement agency has proffered.'") (alterations in original) (quoting *Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 n.5 (1982)). Thus, while the court agrees that it did not *construe* the April 2013 regulations and Access Policy more narrowly in *Kissick* than the text otherwise suggested (in *Kissick*, the court actually concluded, albeit preliminarily, that "*as written*, the permitting requirement draws in too much expressive conduct in exchange for too little administrative benefit," 956 F. Supp. 2d at 1005 (emphasis added)), that ruling has little impact on whether Fell and Weiss *applied* the regulations and Access Policy in a clearly unconstitutional manner.[9]

---

[9] For this same reason, decisions like *State v. Crute*, 2015 WI App 15, 360 Wis. 2d 429, 860 N.W.2d 284, are not determinative of the present case. In *Crute,* the Wisconsin Court of Appeals determined in a careful and well-reasoned opinion that the State had not proven beyond a reasonable doubt that the April 2013 version of Adm 2 was constitutional, because as written it was not narrowly tailored

In this case, Sergeant Weiss and Officer Fell enforced the regulations and Access Policy with respect to Salvia as an apparent member of a group that had grown to include more than twenty participants. While this court noted in *Kissick* that "the holdings of federal courts across the country . . . have virtually unanimously struck down permitting requirements for small groups," *id.* at 1005 (collecting cases), enforcing permitting requirements for *larger* groups has not proven constitutionally problematic to the same degree. *See, e.g.*, *Thomas v. Chi. Park Dist.*, 534 U.S. 316 (2002) (upholding permitting requirements applicable to events involving more than fifty people in a public park); *Grossman v. City of Portland*, 33 F.3d 1200, 1206 (9th Cir. 1994) (noting that "[s]ome type of permit requirement *may* be justified in the case of large groups, where the burden placed on park facilities and the possibility of interference with other park users is more substantial") (emphasis in original); *see also* Nathan W. Kellum, *Permit Schemes: Under Current Jurisprudence, What Permits are Permitted?*, 56 Drake L. Rev. 406-08 (2008) (discussing small versus large group permits).

Indeed, this court itself recognized in *Kissick* that the state "*does* have a significant interest in requiring an advance permit for *every* event that can reasonably be expected to attract large crowds." 956 F. Supp. 2d at 1004 (emphasis in original). In entering a preliminary injunction in *Kissick,* the court also declined to enter a sweeping injunction, recognizing that the state "ha[d] established that some threshold is appropriate." *Id.* at 1007. Instead, it enjoined the two portions of the Access Policy most likely to be

---

to further the state's significant governmental interests. *Id.* at ¶ 51. But this court is not concerned with the statute on its face; it is concerned only with Sergeant Weiss's and Officer Fell's application of the statute to Salvia under the circumstances presented on July 24, 2013. The court also notes that Fell and Weiss would not have had the benefit of *Crute* or the other state court decisions that have issued since July 24 when they made the decision to arrest Salvia, consistent with the DOA's articulated policy.

unconstitutional -- including the enforcement of the permitting requirements with respect to small groups -- in an attempt "to protect the fundamental rights of plaintiff and others like him to freely assemble and engage in speech, while permitting defendants the ability to manage the competing demands on the rotunda and quickly call on additional police officers if necessary." *Id.* This would at least suggest to a reasonable officer that permits may be constitutionally problematic if required for individuals and small groups, but may *not* pose the same concerns when applied to larger groups. And plaintiff cites to no case demonstrating that defendants should nevertheless have known enforcing a permitting scheme against a group of *more* than twenty participants violated the First Amendment, nor has this court found any.[10]

This is not to say that defendants' actions actually *were* constitutional. But the court need not reach that question, because defendants Fell and Weiss are entitled to qualified immunity unless their actions violated *clearly established* law. In light of the foregoing authority, the court cannot say this. "Police are charged to enforce laws until and unless they are declared unconstitutional." *Michigan v. DeFillippo*, 443 U.S. 31, 38 (1979). "The enactment of a law forecloses speculation by enforcement officers concerning its constitutionality -- with the possible exception of a law so grossly and flagrantly unconstitutional that any person of reasonable prudence would be bound to see its flaws." *Id.* Adm 2 and the Access Policy -- at least as applied to larger groups -- do not fit that

---

[10] Indeed, plaintiff's opposition to qualified immunity appears to rest entirely on his contention that the court must consider the regulations as applying to *all* groups, not merely groups of twenty or more -- in other words, he again facially attacks the regulations and Access Policy, rather than as-applied. (*See* Pl.'s Br. Support Summ. J. (dkt. #10) 49 ("It was Clearly Established by July of 2012 that the Enforcement of a Permit Requirement requiring Permits for First-Amendment-Protected Activity *by Individuals and Small Groups* in Public Fora is Unconstitutional.") (capitalization in original) (emphasis added).)

description, and defendants should not be held liable for money damages for complying with the DOA's mandate to continue enforcing them, subject to the guidance of this court in *Kissick*. *Cf. Pierson v. Ray*, 386 U.S. 547, 555 (1967) ("A policeman's lot is not so unhappy that he must choose between being charged with dereliction of duty if he does not arrest when he has probable cause, and being mulcted in damages if he does. Although the matter is not entirely free from doubt, the same consideration would seem to require excusing him from liability for acting under a statute that he reasonably believed to be valid but that was later held unconstitutional on its face or as applied.") (footnote omitted).

Plaintiff raises a few other challenges to defendants' conduct that warrant a brief discussion. First, he points out that technically, Fell and Weiss did not comply with the exact terms of the injunction in *Kissick*, because they enforced the regulations and Access Policy with respect to a group that *did* exceed twenty persons, rather than a group *anticipated* to exceed twenty persons. *Compare* Decl. of David Davis (dkt. #16) ¶ 3, *with Kissick,* 956 F. Supp. 2d at 1007 (Order). Plaintiff's concern is valid, as protesters anticipating the DOA's enforcement of the injunction as written might not have notice of the DOA's actual practices, but the operative question for qualified immunity purposes is not whether defendants' actions adhered faithfully to the injunction in *Kissick*; the question is whether their actions violated clearly established law. Defendants' legitimate interests in managing competing demands on the Capitol space are still served by enforcing permitting requirements as to a group that *actually* exceeded twenty people, even if that enforcement is not perfectly in line with the equitable relief this court fashioned in *Kissick*. Regardless, the officers gave repeated warnings, twice by broadcast and three times personally, before

24

plaintiff's arrest, making it reasonable for these two individual officers to believe in good faith that an arrest was permissible, whether ultimately correct or not.

Second, plaintiff argues that the court implied in *Kissick* that it would likely have: (1) declared the Access Policy's permitting scheme unconstitutional on its face in the small-group and content-based context; and (2) refused to sever those provisions from the whole, out of concern that doing so would produce an unclear regulatory scheme. *See* 956 F. Supp. 2d at 1006-07. The court in *Kissick*, however, did *not* make any final determination with respect to severance of the problematic provisions. *Id.* at 1007. More importantly for purposes of this case, uncertainty as to what this court did or did not *imply* with respect to severability in *Kissick* only underscores that defendants' application of the regulations and Access Policy was not clearly unconstitutional.

Third, plaintiff devotes some time to addressing his status as a journalist and his First Amendment right to record the activities of the police. Certainly, "[t]he act of making an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech and press rights as a corollary of the right to disseminate the resulting recording." *Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012). But defendants did not arrest Salvia for taking pictures of the Solidarity Sing Along, nor for acting in some other way unique to being a journalist; they arrested him for intentionally refusing to leave an unlawful event. Furthermore, Salvia's status as a journalist imbues him with no unique immunity. Indeed, the parties agree that "if Mr. Salvia could have been lawfully arrested as a lay observer of the Sing Along and the police response to it, he could lawfully be arrested as a journalist." (Pl.'s Br. Reply (dkt. #35) 14; Defs.' Br. Reply (dkt.

25

#37) 11.)[11]  Accordingly, defendants Fell and Weiss did not violate clearly established law when they arrested Salvia under the April 2013 version of Adm 2 and the Access Policy. The court will, therefore, grant defendants' motion and deny plaintiff's with respect to the First Amendment claim.

### III.    False Arrest

In contrast to being arrested for refusing to leave what the officers had deemed an unlawful assembly, the right not to be arrested without probable cause is, of course, a clearly established right.  *See Biddle v. Martin*, 992 F.2d 673, 675 (7th Cir. 1993).  But this characterization of the relevant inquiry here is an oversimplification: the real issue is "whether the law was clear *in relation to the specific facts* confronting the public official when he or she acted."  *Apostol v. Landau*, 957 F.2d 339, 341 (7th Cir. 1992) (emphasis added) (quoting *Green v. Carlson*, 826 F.2d 647, 649 (7th Cir. 1987); *Colaizzi v. Walker*, 812 F.2d 304, 308 (7th Cir. 1987)).  In other words, courts must "define the 'clearly established' right at issue on the basis of the 'specific context of the case.'"  *Tolan v. Cotton*, 572 U.S. ___, 134 S. Ct. 1861, 1866 (2014) (quoting *Saucier*, 533 U.S. at 201).

Moreover, when addressing qualified immunity at the summary judgment stage, "courts must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions."  *Id.*  Accordingly, the court must assess whether, viewing the record in the light most favorable to plaintiff, reasonable officers would have known they were effecting an arrest without probable cause.

---

[11] As discussed in the next section of this opinion, however, there is a factual dispute as to whether Salvia *was* lawfully arrested based on probable cause, and *that* question remains for trial.

The analysis here turns primarily on a single factual dispute: whether Salvia was complying with officers' orders to leave the gathering when he was seized and arrested. Plaintiff maintains that he was:  Salvia's sworn declaration indicates that in response to Fell's warning, he "began to walk away, intending to obey the command to leave the area" when Weiss suddenly ordered Fell to "95 him."  (Decl. of Philip Dominic Salvia (dkt. #11) ¶¶ 7-9.)  Crediting Salvia's firsthand testimony, as the court must on summary judgment, certainly suffices to create a genuine dispute of fact.  *See Berry v. Chi. Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010) ("If based on personal knowledge or firsthand experience, [uncorroborated testimony from the non-movant] can be evidence of disputed material facts.  It is not for courts at summary judgment to weigh evidence or determine the credibility of such testimony; we leave those tasks to factfinders." (internal citations omitted).)

Comparing this conduct to the provisions of the administrative code in question, the court looks first at § Adm 2.14(2)(v), under which Salvia was *actually* cited.  That section prohibits persons from "conduct[ing] an event" in DOA-managed buildings without departmental approval.  Defendants have never argued that Salvia was "conducting" an event, at least not before this court, and nothing in the record suggests that such a belief would have been objectively reasonable.[12]  In fact, it is undisputed that Officer Fell *actually* issued a citation to Salvia for "participating in an unlawful event," although defendants' brief in reply characterizes the reference to § Adm 2.14(2)(v) as an error due to the recent

---

[12] Because defendants have not asserted otherwise in response to plaintiff's argument, the court assumes without deciding that to "conduct" an event within the meaning of § Adm 2.14(2)(v) means to act in a *leadership* capacity, consistent with the ruling of Judge Julie Genovese of the Dane County Circuit Court in *State v. Huberty*, Case Nos. 12-FO 2437, 12-FO-2681, 12-FO-2842.  (*See* Decl. of Maria S. Lazar Ex. J (dkt. #19-10) Transcript of Motion Hearing at 12-13 (Jan. 17, 2013).)

revision of the administrative code and creation of new subsection (vm).  (*See* Defs.' Br. Reply (dkt. #37) 10 ("The Defendants unintentionally cited Salvia under the former (v), even though they clearly informed him and stated in their declarations that Salvia was cited for participating in an unlawful assembly and refusing to leave the unlawful assembly.").) Accordingly, defendants have effectively conceded they lacked probable cause to arrest Salvia pursuant to § Adm 2.14(2)(v).

Of course, this does not end the inquiry.  Defendants need only have had probable cause "to arrest [Salvia] for *any* offense."  *Williams v. Rodriguez*, 509 F.3d 392, 399 (7th Cir. 2007) (emphasis added).  Section Adm 2.14(2)(vm), upon which defendants now rely in arresting Salvia, prohibits "intentionally fail[ing] or refus[ing] to withdraw from" an unlawful assembly after it has been declared unlawful.  But crediting plaintiff's version of the facts, again as the court must in resolving defendants' motion, he eventually withdrew, or at least began to withdraw, before his arrest.  According to Salvia, he had already begun to comply with defendants' commands that he leave the Capitol when they placed him under arrest.  It would defy logic to hold that reasonable officers could believe they had probable cause to arrest Salvia for refusing to leave an assembly *as he was leaving the assembly*.[13]

---

[13] Salvia submitted what he terms an "audiovisual record" of his arrest in support of his motion for summary judgment and in opposition to defendants' motion.  (Dkt. #36.)  That recording splices together video, taken by "another person" at the Capitol, with audio that Salvia himself recorded. (Decl. of Philip Dominic Salvia (dkt. #11) ¶ 22.)  Leaving aside the question of how reliable that "audiovisual record" is during the critical moments before Salvia's arrest (given that Salvia had to re-assemble it from multiple sources after the fact), it is still not clear from the video what he is doing. (*See* Video, at 3:10-3:30 (July 24, 2013) (on file with court).)  On balance, the video is not, in any event, clear enough to preclude a reasonable jury from believing *either* party's version of the facts.  *Cf. Scott v. Harris*, 550 U.S. 372, 380-81 (2007) (dashboard video camera "blatantly contradicted" respondent's version of car chase such that "no reasonable jury could have believed him").

This leaves one last line of defense, which unfortunately defendants argue in a single sentence -- that even if Salvia *was* in the process of leaving when he was arrested, they still had probable cause to cite him "for his failure to comply with the sign, with the two broadcast announcements and with the initial demands to cease and desist."   (Defs.' Combined Br. Support & Opp'n (dkt. #14) 30.)  They concede, however, that the sign and broadcasts are warnings expressly directed at *participants*, while failing to explain why those warmings would have any meaning to a spectator like Salvia, who arrived separately from the Solidarity Singers, did not join in the singing and, at least according to Salvia, merely stood to the side and took pictures.

Even Officer Fell's first verbal warning apparently referred to him as a "participant." And, of course, the parties dispute whether Salvia began to leave when Fell made clear that he had to do so "right now."  Perhaps the code, as written, allows for liability based merely on continued presence, as opposed to participating, but defendants' argument on the point is so underdeveloped that they have essentially waived it, at least for purposes of summary judgment.  *See, e.g., Pond v. Michelin N. Am., Inc.*, 183 F.3d 592, 597 (7th Cir. 1999).  Thus, defendants have not proven that qualified immunity shields them from liability on the false arrest claim.

On the other hand, the court does not agree with plaintiff that he is entitled to summary judgment on liability, either.  Plaintiff appears to acknowledge in his opening brief that his arrest would be legal if the arresting officer had probable cause to arrest him for *any* offense, including § Adm 2.14(2)(vm), which the court has already determined was not clearly unconstitutional as applied on July 24, 2013.  In defendants' version of the facts, which the court must credit in ruling on Salvia's motion for summary judgment, they

instructed Salvia to leave the site of the unlawful event, but he flatly refused to do so. In this version of events, a reasonable trier of fact could find that, at the very least, defendants had arguable probable cause to arrest and cite Salvia for "intentionally fail[ing] or refus[ing] to withdraw from the assembly after it has been declared unlawful" under Wis. Admin. Code § Adm 2.14(2)(vm), or at least defendants could have so believed in good faith. Accordingly, a trial is necessary to resolve disputed issues of material fact on the question of probable cause, and so the court will also deny plaintiff's motion for summary judgment on the false arrest claim.

ORDER

IT IS ORDERED that:

1) Plaintiff Philip Dominic Salvia's motion for summary judgment (dkt. #8) is DENIED.

2) Defendants Adam Fell and Chris Weiss's motion for summary judgment (dkt. #13) is GRANTED IN PART and DENIED IN PART.

3) A scheduling conference will be set before Magistrate Judge Crocker.

Entered this 31st day of March, 2016.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge